**United States District Court**
**Southern District of New York**
_____

**TODD FLYR,**

                          **Plaintiff,**            09 Civ. 9159 (JGK)

        - against -                **MEMORANDUM OPINION AND**
                                                                  **ORDER**
**CITY UNIVERSITY OF NEW YORK, ET AL.,**

                          **Defendants.**
_____

**JOHN G. KOELTL, District Judge:**

    The plaintiff, Todd Flyr, sues his former employer under 42 U.S.C. § 1983 for allegedly terminating his employment in retaliation for his exercise of his First Amendment rights of free speech and free association. The defendants, City University of New York ("CUNY"), Borough of Manhattan Community College ("BMCC"), and Richard Chorley, a professor at BMCC, move to dismiss the Amended Complaint for failure to state a claim, arguing that the plaintiff's activities were not protected by the First Amendment.

                                                 **I.**

    In deciding a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the complaint are accepted as true and all reasonable inferences must be drawn in the plaintiff's favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007); Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d

Cir. 1995).  The Court should not dismiss the complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009).  While the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Id.; see also SEC v. Rorech, 673 F. Supp. 2d 217, 221 (S.D.N.Y. 2009).

In deciding the motion, the Court may consider documents that are referenced in the complaint, documents that the plaintiffs relied on in bringing suit and that either are in the plaintiffs' possession or were known to the plaintiffs when they brought suit, or matters of which judicial notice may be taken. Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); see also Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993).

## II.

The following facts are assumed to be true for purposes of this Order.

In 2003, the plaintiff applied for and received a "Professorial Track" position in the Computer Information Systems Department ("CIS") at BMCC, which is a part of CUNY. (Am. Compl. ¶¶ 5, 7, 11-15.) The plaintiff's contract was annually renewable and had a five-year tenure clock. (Id. ¶ 16.)

CIS contained two "primary factions, internally allied and hostile" to each other, one led by department chair Alice Cohen, who had recommended the plaintiff's hire, and one led by defendant Chorley. (Id. ¶¶ 14, 17.) According to the plaintiff, Chorley was unhappy with him from the time of his hiring, giving him a poor performance review in contrast to positive reviews that the plaintiff received from Cohen. (Id. ¶¶ 18, 23-25.)

The plaintiff describes two sets of events that, he claims, led Chorley to retaliate further against the plaintiff, ultimately leading to the non-renewal of his contract after the 2006-2007 academic year. (Id. ¶ 60.)

First, in or about May 2005, Cohen stepped down from the CIS chairmanship, leading to a contentious election campaign between Chorley and another professor, Kok, for the open seat, a race covered by "numerous blogs and message boards." (Id. ¶¶ 31-33.) As the plaintiff conceded at oral argument, the plaintiff had a vote in this election as a professor in the CIS

3

department.  The plaintiff "actively participated in supporting Kok," sending an email on Kok's behalf and "lobb[ying] aggressively for Kok's election with personnel in the CIS department."  (Id. ¶ 34.)  Chorley ultimately won the election by one vote.  (Id. ¶ 36.)  From this point forward, the plaintiff alleges, Chorley "took it upon himself to retaliate against" the plaintiff for his role in supporting Kok, including fabricating student complaints and changing the plaintiff's work assignments.  (Id. ¶ 36-38.)  Chorley allegedly admitted to the plaintiff that he was doing so in retaliation for the plaintiff's support for Kok.  (Id. ¶ 39.)

Second, the plaintiff "voluntarily involved himself with numerous grant writing projects, all of which were designed primarily to benefit the students at BMCC, as well as the community at large," "[i]n addition to his required teaching responsibilities."  (Id. ¶ 20.)  The plaintiff was not "required" to do so "by the leaders of his department" and "had no expectation that he would be one of the BMCC professors assigned to administer a grant once it was approved."  (Id. ¶¶ 21-22.)

In or about January 2006, the plaintiff was working on a grant writing project that "if approved, would have afforded community members enrolled at BMCC the opportunity to learn how to protect themselves from cyber attack, identity theft, and

4

monetary theft that occurs on the internet." (Id. ¶¶ 45-46.) Two CIS professors who had been collaborating with the plaintiff on a grant-writing project were "implicated in a plagiarism scandal." (Id. ¶¶ 44-45.) As part of an "extended dispute . . . over email" about the two professors' involvement with the grant, the plaintiff "actively spoke out" against the involvement of these professors in the grant, "due to his concern over jeopardizing the grant and its public safety opportunities." (Id. ¶ 48.) Both of these professors had supported Chorley in the election, and Chorley "exacerbated his . . . retaliation" against the plaintiff as a result of the plaintiff's opposition to them. (Id. ¶¶ 44, 49.)

Chorley's antagonistic actions continued, including various complaints and negative evaluations, ultimately culminating in the orchestration of the plaintiff's non-reappointment at BMCC. (Id. ¶¶ 50-59.) In a letter dated December 6, 2006, the plaintiff was informed that his employment at BMCC would be terminated on August 31, 2007. (Id. ¶ 60.)

### III.

On October 3, 2009, the plaintiff filed suit against the defendants in this Court, alleging § 1983 claims against all three defendants for violations of his First Amendment rights to free speech and free association and for due process violations. After the defendants moved to dismiss the complaint, the Court

dismissed the due process claim with prejudice but allowed the plaintiff to amend his complaint to replead the First Amendment claims.  (Doc. No. 18.)  The Amended Complaint includes two counts alleging a violation of 42 U.S.C. § 1983.  The first count alleges a violation of the First Amendment right to free speech and the second count alleges a violation of the First Amendment right to free association, both actionable under 42 U.S.C. § 1983.[1]

The defendants now move to dismiss the Amended Complaint, arguing that the plaintiff's speech and associations were "pursuant to [his] official responsibilities," Garcetti v. Ceballos, 547 U.S. 410, 424 (2006), and were not made on a "matter of public concern," id. at 418 (quoting Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968)).

As to his activities concerning Chorley's election, the plaintiff argues that Garcetti "carve[d] out an exception for engaging in political speech with a colleague, and [does] not subject such speech to the general, catch all citizen/public concern analysis."  (Pl.'s Mem. of Law in Opp'n to Defs.' Mot. to Dismiss ("Pl.'s Mem.") at 10.)  As to his activities regarding the grant proposal, the plaintiff argues, first, that the grant proposal was "purely voluntary" and therefore not

---

[1] The plaintiff had also included a claim under 42 U.S.C. § 1985 in his first complaint, but he did not include that claim in his Amended Complaint.

pursuant to his official responsibilities and, second, that he was speaking on a matter of public concern because he was "motivated by [his] desire to provide individuals in the Manhattan community with the opportunity to receive an education about how to protect themselves from new age cyber crimes." (Id. at 14, 17.)

**IV.**

**A.**

"[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." Garcetti, 547 U.S. at 417.  Thus, "a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." Connick v. Myers, 461 U.S. 138, 142 (1983).  However, public employees must "by necessity . . . accept certain limitations on [their] freedom," because their speech can "contravene governmental policies or impair the proper performance of governmental functions." Garcetti, 547 U.S. at 418-19.  Accordingly, in assessing whether a public employee's speech is protected from retaliation, the Court asks "(1) whether the employee spoke as a citizen on a matter of public concern and, if so, (2) whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public."

7

Anemone v. Metro. Transp. Auth., 629 F.3d 97, 114 (2d Cir. 2011) (internal quotation marks omitted).[2]

The first prong of this analysis contains two components: the employee must speak "as a citizen" and must speak "on a matter of public concern."  Employees do not speak "as citizens for First Amendment purposes" when they "make statements pursuant to their official duties."  Garcetti, 547 U.S. at 421. Whether a statement is pursuant to official duties should be determined through an "objective" and "practical" inquiry, because the scope of the employee's duties is not determined by a formal job description.  Weintraub v. Bd. of Educ., 593 F.3d 196, 202 (2d Cir. 2010) (quoting Garcetti, 547 U.S. at 424). Speech need not be "required by, or included in, the employee's job description, or in response to a request by the employer," so long as it is "a means to fulfill, and undertaken in the course of performing," one of the employee's "primary employment responsibilit[ies]."  Id. at 203 (internal quotation marks and citations omitted).  Although "[n]o one factor has been found to be dispositive in ascertaining whether a public employee was speaking as a citizen for First Amendment purposes," Carter v. Inc. Vill. of Ocean Beach, 693 F. Supp. 2d 203, 212 (E.D.N.Y.

---

[2] Garcetti acknowledges the possibility that "expression related to academic scholarship or classroom instruction implicates additional constitutional interests that are not fully accounted for by this Court's customary employee-speech jurisprudence."  Garcetti, 547 U.S. at 425.  The plaintiff has not suggested that this concern is implicated in his case.

2010), aff'd, No. 10-0740-cv, 2011 WL 924471 (2d Cir. 2011), it is relevant whether there is a "citizen analogue" to the form that the speech took, Weintraub, 593 F.3d at 203-04.

The second requirement is that the speech be on a matter of public concern. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement," but it is ultimately a question "of law, not fact." Connick, 461 U.S. at 147-48 & n.7. "When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." Id. at 146. In particular, a public employee speaking "as an employee upon matters only of personal interest" is unprotected, as are "employee complaints over internal office affairs." Id. at 147, 149. Otherwise, "[t]o presume that all matters which transpire within a government office are of public concern would mean that virtually every remark . . . would plant the seed of a constitutional case." Id. at 149.

**B.**

The plaintiff has not shown that either of his alleged protected activities addressed a matter of public concern.

9

a.

With regard to his speech related to the election, the plaintiff makes a threshold mistake by relying on a statement in Garcetti that employees retain "some possibility of First Amendment protection" for various activities, including "discussing politics with a co-worker." Garcetti, 547 U.S. at 423. The plaintiff inflates this comment into a per se protection for the comments the plaintiff made about the departmental election. By doing so, he confuses Garcetti's comment about "politics" with "office politics" or "academic politics," which were plainly not covered. Garcetti's reference to politics was a reference to governmental matters, not private matters. This is clear from Garcetti's citation to Rankin v. McPherson, 483 U.S. 378 (1987), in which the speech held to be protected was a "brief conversation with [a] co-worker" about the attempted assassination of President Reagan conducted by a typist with "no law enforcement responsibility." Id. at 392 (Powell, J., concurring).

A matter that involves politicking and electioneering is not invariably "political" in the relevant sense; rather, a departmental election may be a matter of "internal office affairs," Connick, 461 U.S. at 149, in which an employee's speech expresses personal preferences rather than public concerns. The election of a department chair may be of great

10

interest to the faculty of the department, but "a matter of concern to the academic community does not automatically translate into a 'matter of public concern.'"  Isenalumhe v. McDuffie, 697 F. Supp. 2d 367, 379 n.8 (E.D.N.Y. 2010) (quoting Ezuma v. City Univ. of N.Y. ("Ezuma II"), 367 Fed. App'x 178, 179 (2d Cir. 2010) (summary order)); see also Ezuma v. City Univ. of N.Y. ("Ezuma I"), 665 F. Supp. 2d 116, 130 (E.D.N.Y. 2009, aff'd, 367 Fed. App'x 178 (denying First Amendment claim where "there was open academic warfare" in a department "either stemming from or reflecting" a departmental chairmanship dispute).  Several courts have found that the procedural nuances of internal elections are not matters of public concern.  See, e.g., Bunger v. Univ. of Okla. Bd. of Regents, 95 F.3d 987, 992 (10th Cir. 1996) ("The organization of such internal governing bodies is not an issue of social importance of heightened public interest.  Although many an academic donnybrook has been fought over such administrative rules, the issues at stake rarely transcend the internal workings of the university to affect the political or social life of the community."); Ezuma I, 665 F. Supp. 2d at 130-31; Boyett v. Troy State Univ. at Montgomery, 971 F. Supp. 1403, 1417 (M.D. Ala. 1997), aff'd, 142 F.3d 1284 (11th Cir. 1998) ("[T]he Plaintiff's . . . comments on the election of members to the Graduate Council . . . concerned an internal management dispute and . . . the plaintiff was speaking

11

as an employee, not a citizen."); Edmundson v. Borough of Kennett Square, 881 F. Supp. 188, 194 (E.D. Pa. 1995) ("Plaintiff complained that the association should hold elections for officer positions [and] have secret ballots for these elections . . . . Benign matters of internal procedure are rarely of public concern.").

Here, there is no indication that the election race between Kok and Chorley was of more than internal concern — or, importantly, that the plaintiff's participation in particular reflected anything more than a personal interest.  The Amended Complaint does not identify any ground for the plaintiff's opposition to Chorley's chairmanship that is of remotely public concern; rather, the pleadings focus exclusively on a factional struggle born of "personal and professional allegiances and loyalties."  (Am. Compl. ¶ 17.)  Thus the plaintiff has failed to allege that his statements were the product of anything more than an internal skirmish in which he was personally interested, rather than a matter of public concern.  See, e.g., Ezuma, 367 Fed. App'x at 180 ("Here, the record evidence demonstrates — at best — that Ezuma's challenge to his colleague's credentials was intended to express his personal dissatisfaction with CUNY's choice of an acting chair and the implications of that choice on his department's image.  Accordingly, on the particular facts of this case, Ezuma's colleague's failure to obtain a doctoral

12

degree from a properly accredited university was a matter of concern within the academic community and not the public at large. . . . Ezuma's speech did not pertain to a matter of public concern . . . ."); see also Connick, 461 U.S. at 148 (holding speech unprotected where it is a "mere extension[] of a dispute over a personal employment matter).

Accordingly, the plaintiff has failed to state a claim regarding his speech about the departmental election.

b.

The plaintiff's comments regarding the best method for applying for a grant similarly do not touch on a matter of public concern.

The plaintiff claims that the success of the grant application would have a beneficial impact on the BMCC community, and that therefore his complaints about the participation of certain colleagues in the application rose to the level of a matter of public concern. But not every internal decision as to the best way to undertake a project that would serve the public is of constitutional status. To constitutionalize the details of a grant application would ignore the Supreme Court's command that "government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." Connick, 461 U.S. at 146. It is hard to see how

13

the plaintiff's argument would not extend to any choice, no matter how small, that might conceivably affect the odds of the acceptance of every grant application or the effectiveness of any other government activity.  See Isenalumhe, 697 F. Supp. 2d at 377 ("[S]peech is not protected simply because it relates to the workings of a public entity . . . .").  The sole distinguishing factor that the plaintiff identifies is that the grant at issue here involved public safety classes.  However, it cannot be that all matters that in any tangential way relate to public safety are matters of public concern.

Connick illustrates the overbroad nature of the plaintiff's argument.  In Connick, an assistant district attorney was fired after circulating "a questionnaire soliciting the views of her fellow staff members concerning office transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, and whether employees felt pressured to work in political campaigns."  Id. at 141.  Each of these topics has at least as much impact on overall public safety and the government employer's ability to serve the public as does the grant application at issue here, yet the Supreme Court held that none but the question about political campaigns touched on a matter of public concern.  Id. at 148.  The Court reasoned that "[t]o presume that all matters which transpire within a government office are of public concern would mean that

14

virtually every remark . . . would plant the seed of a constitutional case."  Id. at 149.  The same reasoning applies here.  The speech that the plaintiff has identified fails to touch on a matter of public concern.

Accordingly, the plaintiff has failed to state a claim regarding his speech about the grant application.[3]

### IV.

The plaintiff asserts that the defendants violated his right to free association in addition to his right to free speech.  "[A] public employee bringing a freedom of association claim must demonstrate that the association or associational activity at issue touches on a matter of public concern."  Cobb v. Pozzi, 363 F.3d 89, 107 (2d Cir. 2004).  The public concern analysis is the same for an association claim as it is for a speech claim.  Id. at 105.  Accordingly, the plaintiff's free association claims also must be dismissed.[4]

---

[3] Because the plaintiff has failed to identify a matter of public concern, there is no need to consider whether his speech was made pursuant to his official duties.

[4] Courts are divided as to how Garcetti applies to free association claims. Compare D'Angelo v. Sch. Bd., 497 F.3d 1203, 1212 (11th Cir. 2007) ("[T]he requirement of Garcetti applies to the right of a public employee to associate as it applies to the rights of a public employee to speak and to petition the government."), with Trujillo v. Huerfano Cnty. Bd. of Cnty. Comm'rs, 349 Fed. App'x 355, 360 (10th Cir. 2009) (non-binding order) (holding that Garcetti analysis was inappropriate for a political association claim).  In light of the plaintiff's failure to satisfy the public concern requirement, it is unnecessary to consider this issue.

## CONCLUSION

For the foregoing reasons, the defendants' motion to dismiss is **granted**. The Amended Complaint is **dismissed with prejudice**.[5] The Clerk is directed to enter judgment dismissing the Amended Complaint and closing this case. The Clerk is also directed to close all pending motions.

SO ORDERED.

Dated:   New York, New York
         April 25, 2011

John G. Koeltl
United States District Judge

---

[5] The Court previously granted a motion to dismiss the original complaint, but allowed the plaintiff to replead his First Amendment claims. (Doc. No. 18.) "[A] dismissal with prejudice is generally appropriate where a court puts a plaintiff on notice of a complaint's deficiencies and the plaintiff fails to correct those deficiencies after amendment." Abu Dhabi Commercial Bank v. Morgan Stanley & Co., No. 08 Civ. 7508, 2009 WL 3346674, at *2 (S.D.N.Y. Oct. 15, 2009); see also id. at *2 n.14 (collecting cases).